NO. 8696

COURT OF APPEAL

PARISH OF ORLEANS

-----

MRS. LUCILLE REY

**8696**

versus

NEW ORLEANS GAS LIGHT COMPANY.

-----

-----

June 19-22

**8696**

Dinkelspiel: J.

we quote from defendant's brief which we consider is a statement of fact ⌐ shown by the pleadings:

"This is a suit by Lucille C. Rey against New Orleans Gas Light Company for damages for cutting off of gas service.

The petition avers that the defendant entered into an agreement with plaintiff to supply her with gas for cooking and illuminating purposes at her residence in the City of New Orleans, and to determine the quantity of gas consumed by her the said Company installed in the house occupied by her a prepay meter so constructed and arranged that by dropping a twenty-five cent piece in a slot in said meter gas to the value of twenty-five (25¢) cents could be used; that on October 18, 1921, the agents, employees and representatives of the defendant, acting under orders and in the course of their employment, called at the residence of plaintiff and, after announcing their intention to cut off the gas supply and to remove therefrom said prepay meter, upon the refusal of the defendant to permit the removal of said gas meter, they went under the house in which petitioner resided and disconnected the pipes through which the gas flowed or was carried from the supply pipes or mains in the street to said meter inside petitioner's residence, thereby cutting off the gas; that the act of defendant's agents and employees was deliberate, malicious, illegal, without warrant of law, and done with the intent to cause injury and damage to plaintiff; that plaintiff notified the company of its said employees' action, but the defendant refused to reconnect said gas; that plaintiff has been seriously damaged and injured by the defendant in cutting off and depriving her of the use of gas and prayed for damages in the sum of $750.00.

Defendant denied that it had entered into any agreement with Lucille C. Rey, plaintiff herein, for the

437

furnishing and supplying of gas for cooking and illuminating purposes. It admitted that under date of January 19, 1918, one Mrs. A. Rey made application to it for gas service at the premises No. 304 South Telemachus Street, which application was accepted by defendant and, in accordance therewith, a prepay meter for the purpose of measuring the quantity of gas consumed installed. It denied all other allegations of the petition, except that it admitted that on October 18, 1921, its employees, under its orders, called at the residence above stated for the purpose of cutting off the gas supply and removing said prepay meter, and upon refusal of a lady on the premises to permit the removal of said prepay meter, disconnected the service pipe under said premises leading to said meter, thereby cutting off said gas supply. Defendant averred that before cutting off the gas service on said premises No. 304 South Telemachus Street, due demand was made by it upon the said Mrs. A. Rey for payment of a balance due for gas consumed at said premises and due notification given that upon failure to pay, the gas service would be cut off, and that it was fully justified in cutting off said service."

The testimony in this case is more or less admitted.

It is admitted that plaintiff applied to defendant for gas service at the residence 304 South Telemachus Street on a prepay basis, that the application was accepted and meter installed, that the meter was a prepay meter and was constructed and arranged that by dropping a quarter or twenty five cent piece in the slot in said meter, gas to the value of twenty five cents could be used by the applicant; it has been proven that in the latter part of June, 1921, an employee of the defendant called at the premises for the purpose of changing the meter; that he took out meter No. 31626 and installed therein meter No. 38191; that on that day, the reading of said new meter was 449, and a memorandum made of said reading at the time; that subsequently, July

438

2.. ... 1 The reading of the said meter was 486 a difference .. 2700 cubic feet, showing $5.29 of gas consumed and that there . . at that time only seventy five cents in said meter when the stripper took the money out of same; and subsequently, August 22nd, 1921, said meter reading was 528 or a difference between that and the prior reading of July 22nd, of 4200 cubic feet of gas, showing $6.64 of gas consumed and that the meter stripper found in August only seventy five cents in said prepay meter. Subsequently the defendant sent one of its employees to said premises about August 29th, 1921, the purpose being to change the meter, this employee took out said meter bearing No. 38191 and installed meter No. 45469; the reading of the meter 38191 removed on that day was 539, or a difference between that and the reading on August 22nd, 1921, of 1100 cubic feet of gas, showing $1.24 gas consumed, the meter No. 38191 was not stripped on the premises but was taken to the shop of defendant and turned over to another employee who verified the reading of said meter, stripped the same and found no money at all therein. The reading . of June 22th, July 22nd, August 22nd and August 29th, showed gas consumed to the total amount of $13.67, and the money in said meter being only $1.50, left a balance of $12.17 due by the plaintiff.

It is further shown that by letters written on different dates commencing September 15th, 1921 and again on September 23rd, 1921, plaintiff was informed that unless said bill was paid in three days the meter would be removed; subsequently again on September 28th, 1921, the meter was ordered removed, plaintiff refusing to permit the removal of said meter. On October 10th, 1921, a letter was written to her that unless the bill was paid, service would be discontinued; to all these letters plaintiff paid no attention, so that a/cut off order was issued October 14th, 1921 and on October 13th, 1921, the bill not having been paid, service was cut out.

Plaintiff's brief and in the argument does not

439

clusant that a public service corporation is obliged to do business on credit or to render service and then wait for payment and through the entire evidence in behalf of plaintiff, quoting from plaintiff's brief:

"There is no dispute regarding the facts in this case and the question submitted for decision is one of law."

In a recent case decided by the District Court and attached as a part of defendant's brief, is a copy of the opinion of the learned Judge, the Honorable Hugh C. Cage, in the case of State ex Rel George Montgomery, versus New Orleans Gas Light Company, being No. 135310, which opinion and decision we quote in full:

"In communities living under our modern civilization, especially in large cities, there are certain public services, which, in themselves, are natural monopolies, and, whether are so recognized in law and made monopolies by law, or whether the law ignores and lets them work out the social or natural law, they in the end resolve themselves in monopolies. The service of water to the City did resolve itself into a monopoly, even if it were not made so by law. The telephone service, if thrown wide open to the public, would, and does, in every case wind up in one corporation furnishing the service. A steam railroad within a distance of twenty miles on each side of it has a natural monopoly, and if a new one was to be built within twenty miles, one would die or be absorbed by the other. The furnishing of gas is a natural monopoly, and in every one of these natural monopolies is primarily the duty of the sovereign to furnish this service. The sovereign has the option either to furnish the service itself, and own and operate it, or, when he does not choose to do this, he must farm it out to a contractor, generally called public service corporations. The former or contractor undertakes under his contract to perform the services that were encumbent upon the sovereign, under the contract that he makes with the sovereign, and obtaining certain rights and certain obligations of the citizens

440

towards the farmer, and certain rights and certain obliga-
tions of the farmer toward the citizens, and the Court
will enforce them on both sides.

The testimony before me shows that there is no
method known to human kind, in its present stage of pro-
gress, for measuring the amount of gas consumed, except
the gasometer; that gasometers of standard correctness
are used through all the United States, and, for that
matter, all through the civilized world. No other
method, as I say, of measuring the amount of gas con-
sumed has been found, except the instrument known as
meters. They, like all human inventions are liable to
error—to get out of order and fail to register correct-
ly, and there are instruments known as "testers," by which
the correctness of the gasometer is tested, and these in-
struments are recognized by everone, and were in the con-
templation of the sovereign when it granted this contract
to perform this service, to the farmer. As I say, this
instrument necessarily was in the contemplation of the
sovereign, when the contract was made with the defendant
in this case, that is, the legislative act by which the
service was farmed out and the monopoly given. The ob-
ligation of the farmer or contractor in this case, was to
furnish gas to the inhabitants of the City of New Orleans,
it was its duty and obligation so to do, and in the same
contract it was stipulated that it should have the right
to charge therefor to the various consumers not in excess
of $4.00 per one thousand cubic feet. The very meaning
of the contract taken as a whole is that the contractor
is bound and obligated to furnish this gas to the citi-
zens of New Orleans, but not free, he must be paid for
it. The citizen has a right to exact the furnishing of
gas on paying for it, and it is impossible to hold that
this contractor is obligated to furnish gas without pay.
Dealing with these matters, it is necessary that some
methods, rules and regulations should be made whereby

441

the time and method of payment, shall be governed. For ex-
ample, some reasonable time limit within which the payment
of bills will be made, weekly, monthly, quarterly, semi-
annually, or annually. There is nothing that has been sug-
gested to me that the monthly payment is not a reasonable
regulation. If that be the case, and I think it is, then,
when a month's supply of gas has been served by the con-
tractor, to the citizen, it is the duty of the citizen to
pay for it. The amount that he has consumed can only be
established as I said, by means of this instrument called
a meter. When the meter records a certain amount of gas,
the contractor - the gas company - has the right to pre-
sum that the citizen has used that amount of gas. If the
citizen is under the impression that he has not used that
amount of gas, the only method of determining that fact
as to whether or not he owes for the number of thousands
of feet claimed from him by the gas company, is to test
the meter. When the test is made, on his statement that
he does not believe that he owes the amount claimed from
him, and the meter tests out correctly, I cannot conceive
of any proof of evidence that could overcome such a case.
How would the Courts, in view of the testimony before it,
that the meter is the only known method of determining the
amount of gas consumed, take any other view. There-
fore, as I have said, when the period has been
fixed, and the citizen refuses to pay and then
demands further service, he is not, within the meaning
the contract between the sovereign and the farmer, which
contract only obliges the farmer to furnish the service
upon being paid for it by the citizen, and the regulation
or rule of conduct by which the public contractor would
refuse to give further service seems to be absolutely
reasonable, and the only effective way by which the bus-
iness could be carried on for the benefit of the whole
public. The citizen would have his remedy. He could,
where an apparently unusual bill was presented to him, de-

442

mind a test. He could have the test made, and if his meter
was wrong, it would be immediately seen, and the matter would
be adjusted, but if he was shown that the bill was wrong by
testing the meter, and the contractor - the gas company -
should then demand that he pay it or have his gas cut off,
an entirely different case would be presented, because then
the citizen would be within his right under the contract
made by the sovereign that he stood ready and willing to pay
for the service that was rendered. Therefore, he would have
all the rights given to him under the contract, but, if he
r fuses to pay for the services rendered to him, the con-
tract itself does not require the contractor to render ser-
vices without pay.

Now, in this case, the relator is evidently in good
faith in believing that his bill is exhorbient. He protested.
The gas company had his meter tested to find out whether his
impression that his bill was improper was founded on facts.
A test made by them with the most approved method, showed
that his meter sooner or later was in perfect order, or slight-
ly in favor of the consumer; and, that, therefore, the amount
of gas that it registered was the amount that had been used,
and the amount was due to them.

Under the circumstances, the gas company having
treated all alike, the millionaire and the pauper the same,
it was right and proper that it should apply the same method
to Mr. Montgomery, the relator, in a $25,000 building and
the poorest person in New Orleans, occupying the barest
tenement. Any other ruling would require the gas company
to bring suit for $1.50, $10.00 or $13.00, against thous-
r s in the City, and the Courts would be clogged render-
ing the carrying on of the business of the Courts practically,
impossible.

In my opinion, the mandamus should be discharged."

We also refer to the case of Annapolis Public
Utilities Company vs. Martin, 102 Atl. 465, decided by
the Court of Appeals of Maryland, in which it was held:

"In a consumer's action against a gas company for wrongfully and without just cause shutting off his supply of gas the burden was on plaintiff to offer evidence legally sufficient to show that he was not indebted to the gas company for gas supplied to the premises at the time the supply was shut off; for, unless such evidence was offered, there was a failure of proof to support the allegations of the declaration that the supply was wrongfully and without just cause shut off.

Where a consumer of gas used approximately $23.00 worth during a month, but his meter contained only about $11.00 in quarters in payment, so that he was indebted to the gas company in about $12.00 for gas consumed on his premises when the meter was removed by the company without unnecessary force or disturbance, after his failure to pay by a fixed date on notice, the company was not liable as for wrongfully shutting off the consumer's supply of gas."

To the same effect is Bertram vs. Pacific Gas & E. Co., P. U. R. 1916, C., p. 410 at 412.

Also see Southwestern Tel. Co. vs. Danaher, 238 U. S. 488.

The cases referred to by plaintiff, Bettis versus Singer Sewing Machine Co. 10 Ct. of Appeal. 373, and Greenlee versus Singer Sewing Machine Co. 10 Ct. of Appeal 272, where it was held:

"This is not one of the modes provided by law to enforce payment of past due installments on articles purchased, and parties resorting to such arbitrary methods, and deliberately substituting violence for law, should be made to feel the weight of judicial condemnation."

And the contention made by plaintiff, demanding damages for the reason that defendant resorted to arbitrary methods to enforce payment of a claim it assumed was due by the plaintiff, maintaining that the defendant had taken the law into its own hands instead of taking

444

the process provided by law for enforcement of the obliga-
tions of plaintiff; in our opinion, is not the correct
doctrine, this not being a case of trespass, but being a
case under a contract between the parties, which gave
the right to defendant, in in case of default or non-
payment for gas furnished, to stop the flow of gas
and the use thereof after repeated demands had been
made on plaintiff to pay what was due for use of the
gas and which plaintiff refused to pay.
        conclude
We/ therefore, that under the authorities
and under the admitted statement of facts in this case
that the defendant company had the legal right to cut
off the gas supply from plaintiff's residence and to re-
move the meter; and, therefore, plaintiff having under
her contract agreed to comply with all the conditions of
said contract and having failed to do so, although re-
peatedly requested and having been warned on three dif-
ferent occasions by letters admitted to have been re-
ceived, to pay what was justly due, the cause of action
claimed in this suit for damages cannot be allowed.

        For the reasons assigned, it is ordered, adjudged
and decreed, that the judgment of the Court aquo be and
the same is hereby affirmed, with costs of both Courts
to be paid by plaintiff.

                    -Judgment affirmed-

*Judge Claiborne concurs for
separate reasons —*

445

I do not believe that the plaintiff owed the amount of gas claimed by the defendant. She did not agree to pay for the gas that the meter showed she had consumed; she agreed to buy ~~25¢ as much~~ as much gas as the Company would furnish for the 25¢ she dropped in the slot, not one foot more, and she paid for amount in advance. If the Co supplied more than a quarters worth of gas, it was its loss — But I concur on the decree on the ground that the fact that there was a difference between the amount of gas consumed for the 25¢ and the

amount registered as consumed "authorized the immediate removal of the meter." Such a regulation was reasonable and legal, although printed on the plaintiffs' application for opening gas, and in type so small as not to entitle it to favorable consideration by courts —

446

Claiborne, Judge.

## CONCURRING OPINION.

I do not believe that the plaintiff owed the amount
of gas claimed by the defendant. She did not agree to
pay for the gas that the meter showed she had consumed;
she agreed to buy as much gas as the company would
furnish for the 25 cts she dropped in the slot not one
foot more, and she paid for amount in advance. If the
company supplied more than a quarters worth of gas, it
was its loss. But I concur in the decree on the ground
that there was a difference between the amount of gas
consumed for the 25 cts and the amount registered as ##
consumed "authorized the immediate removal of the meter".
Such a regulation was reasonable and legal, although
printed on the plaintiff's application for opening gas,
and in type so small as not to entitle it to favorable
consideration by courts.